Good morning. May it please the court, my name is Frank B. Hugg. I represent the petitioners, San Francisco Drydock, and Signal Mutual Indemnity Association. It's a good time to prepare for all argument when you've been away from the file for a year. And I think on further reflection, I'll try to eliminate one of the issues before the court, somewhere on a version of the better part of valor is discretion. Namely, while the petitioners believe that the rule against raising a new issue for the first time on appeal does not apply for several reasons, which I could prepare to cite to this panel and the extracts of record and supplemental excerpts, I'll stipulate that that issue is not before the court and withdraw the issues of the residual wage earning capacity under section 8H. That means, if I shall be correct, if not, that the retained wage earning capacity was $933.78 as found in the decision of the judge at excerpts of record page 51 and 52. That number becomes for the post-injury wage earning capacity the law of the case. I think that will narrow it down. And that would make the issue. The principal issue, I assume, is whether there is substantial evidence to support the ALJ's finding with respect to the intent to maintain two jobs. That is exactly the focus I'd like to give. Very well. And I can see that we've got an uphill battle because section 10C has broad parameters, and the parties have agreed that 10C was the proper formula to use. And this court has consistently interpreted, as one should for humanitarian and beneficent social legislation, section 10 in a manner that will, as I quote from Matulik, we are buttressed by the knowledge that some overcompensation is built into the system institutionally. I agree that there is, those are the fundamental principles. But when talking about intent to work two jobs, I'm reminded of one summer, my first job after acquiring a JD, I'd taken the bar and I was waiting for the results of the bar. So I started to work for Fleming Construction as a carpenter's assistant. And then also in the evening, Pineapple Willie's as a waiter at a Polynesian-themed restaurant. Now, did I intend to work two jobs? Absolutely. 7.30 to 3.00 p.m. during the day, 5.30 to 11.30 at night at Pineapple Willie's. Certainly that was my intent for all of three weeks. And then I moved and came to California. This, this, well, the tips weren't so good as I expected, but I declared them. I'm sure you did. I did. It was, well, I could think of another time, too, in high school. My primary job was to go to high school, but that didn't stop me from working for my brother's golf service station. And I still wonder for this day how much I got paid. The same factors of intent are, should be looked at very carefully with some scrutiny of what the facts actually are. Counsel, we have a pretty deferential standard of review here, do we not? I agree. Substantial evidence means more than a mere scintilla. This is the first time I can honestly say with a straight face I know what a scintilla is. It's this case. It's less than a scintilla. I've never had an appeal or even a trial involving the Longshore Act and where, in which we had, we, both sides had accumulated such massive amounts of wage-earning data. We have his annual wages for 11 years preceding the injury. We have the documented days that he worked 2 jobs and 6 years before the injury, 9 days. We have the documents to establish, and they're in the record, the number of times that he worked double shifts after the injury. That was 8 days. 17 days in a period of 6 years is the documented intent to work 2 jobs. Now, you know, a scintilla... Counsel, with respect, there's more, is there not? I mean, it's a, I'm looking at just a couple of them here. Of course, he's got his own testimony that he intended to work 2 jobs. The supervisor at Dry Dock said that he'd been assigned, meaning Zapata had been assigned to a swing shift to, in quotes, accommodate his burlic's job. He worked both jobs between August 9th and August 20th when he was laid off, and then he had a prior history of working 2 jobs that demonstrated he was willing to work as much as possible, including working 2 jobs. Now, you may discount that, but that is evidence, is it not, that on the record, this was there that the ALJ could have taken that into consideration insofar as making a determination of what his intention was. I agree. However, if you examine each component of what you, what Your Honor just read, there's contrary evidence which I'm... That's what ALJs do. They weigh evidence and they make a determination, right? Yeah, but they have to do it in a rational manner that is not arbitrary, capricious, or absurd. This is absurd to, he helped, the other evidence you relied upon, you did not quote, was he helped his brother-in-law paint some apartments. That's not different than my high school or law school years. Who could... He didn't get tips, though. No, he did get paid, he claimed, but he never produced the... Not for painting in high school, though. No, no, no, no. I'm referring to Mr. Zapata. He did get paid, but he did not produce the records of the work that he did at the brother-in-law's unit. But to the 3 points that you quoted, Your Honor, yes, Mr., that's exactly what Mr. Neelan said. But he also said, and the judge discounted, ignored what would make it substantial evidence, his testimony that he found a better job and he took it. He had been working for that second company since early May of the year of the injury. This man was going through a career change. A career change does not result in a loss of wage or any capacity. Let's take what he just said. An average weekly wage. He found a better years is my only response to that. I mean, it's an iota. It's an atom. It's the small... Scintilla, I'm reminded of the medieval expression, how many angels can dance on the head of a needle or pen or whatever. Never figured that out. Well, I don't think we can figure out his intent because he did not demonstrate... Actions speak louder than words. He did not there must be some limits on how you calculate average weekly wage in a reasonable manner. Further, this is not a small... She did totally ignore the issue of the ship industry and decline. I gave you the numbers. At one point, at the time of the injury, there was 300 to 500 employees at this shipyard, less than a mile from here. At the time of the hearing, the number of employees was... I'm sorry, in 2006, it was 300. And in 2007, they were down to 153 employees. 153 employees is not a mom and pop shop. But calculation of a worker's compensation benefit based on subjective intent, not verified by action, is not healthy. It's not healthy for business. It's not healthy for entrepreneurship. And it doesn't reflect what he actually did. Anybody can say I want to win the California... I intend to win the California lottery. I did in the last chance. But the stretch of the imagination is just about as far. If you counted the actual days, as I did in the brief, there was 53 percent of one percent for 17 days over six years. With respect, counsel, I mean, I appreciate you've given a lot of thought to this. I mean, it's a pretty liberal standard. And we're looking at whether the ALJ could weigh the evidence that I cited plus others, and then look at what you cited and come up with a determination, in this case, one that you don't agree with. But isn't that the role of the ALJ? It's not absurd on its face, is it? It is. I agree with it, but it's not absurd. No, that's entirely my point. I would... I don't like substantial evidence appeals because I'm looking for facts. But the facts have that outer boundary of rationality. The man didn't work two jobs, period. I mean, he worked 17 days of two jobs. Well, I understand. I think you're a good witness for your side. But the arbitrator didn't agree with the witnesses on your side and credited the testimony that was given. So that's what I'm struggling with. I mean, I'm not saying your position is irrational either. But the fact that the ALJ did not weigh the evidence, which is fine, which is sad for everyone, is not something that's taken into account by this law, is it? Well, then how do we... I'd answer the question by posing a question. How do we determine what is more than a mere scintilla? I've asked that... I ask that not every night I go to sleep, but every night I have an oral argument and I'm going to sleep. What is it? There must be some outer boundary of the scintilla. You're calling it a scintilla. That's not what the ALJ thought. And looking at this right here, given the amount of evidence that comes in, I don't think I would consider it a scintilla. Whether it's substantial is, of course, the issue before us. Which is the definition of substantial evidence, more than a mere scintilla, case after case after case. There are many other average weekly wages that could have been established. The evidence is... Excerpts of Record 112 listed his wages. By the combination, by the judge's combination of one year before injury and one year after injury, she comes up, the judge came up with a wage figure of over $98,000, $96,000. He never made $96,000 as long as he lived. With all due respect to the deference afforded to the ALJ, what rational means could that have been extended to $98,000 when the most he ever earned was $67,000 and the lowest he ever earned was $43,000? There must be some rational relationship, but I appreciate the Court's time and I think you understand our argument. Very well, Counsel, you have some reserved time. Thank you. We'll hear from the Respondent. May it please the Court. I am Joshua Glellen, appearing on behalf of Mr. Zapanta. I think the Court understands correctly that this is a pretty much a stock substantial evidence question that is before the Court, and that the ALJ did have evidence not only the claimant's direct testimony that that's what he would have done but for the injury, but the other circumstances that the ALJ enumerated in relying on and reaching her conclusion at pages 32 to 34 of the record excerpts. From the time that Mr. Zapanta obtained the light-duty burlex job until his neck injury precluded any further shipyard work, based on doctor's recommendations and the results of the MRI that showed just how precarious his neck situation was, he arranged to work non-day shifts at the shipyard when there was work available there and worked every single available shift until, again, until two weeks after the, a week and a half after the neck injury when he was laid off, and then he could not have appeared for more work because the doctors had diagnosed his neck condition as foreclosing that work. I think that and the supervisor's testimony, which the ALJ certainly reasonably interpreted to mean Mr. Zapanta's although burlex was now his main job, intended to continue working all available shipyard shifts. I think those two things, the claimant's own testimony plus the supervisor's testimony about what he understood from Zapanta, certainly is substantial evidence to support the ALJ's resolution of the credibility. Counsel, let me just ask you this one thing. The opposing counsel argued, just as he was about to sit down, that the award, which he characterized as being the 98,000 range, was far above what your client earned while he was working full-time at the shipyard. Any comments on that? Yes. There are two cases that have been before this Court previously, one of which is cited by the ALJ and in the case, and there's another that's cited in Palacios, Bonner, in which the claimants had recently gotten jobs that paid far more than their previous employment had. The other circuits have had cases on very similar facts. When you've recently gotten the job, of course your annual earning capacity forward-looking as of the time of the claimant, would have been far more than what he earned before when you, in some cases, the claimant had only been a babysitter before and had earned hardly anything. But having gotten a shipyard painting job and with the prospect of continued employment like that, the claimant's earnings would have been far in excess of what he or she had earned previously. So from your perspective, even though the yard may feel it's unfair, the reality is that's the way the law is drafted and our case law tends to affirm the fact that if you had this new job with higher benefits, that's just the way that math works out. Precisely. Because earning capacity under Section 10C of the Act is a forward-looking concept, and even though the claimant previously had not had such high earnings, he reasonably could have expected to enjoy those much higher earnings in the I thank the Court for its attention. If you have no further questions. No further questions. Thank you, counsel. Thank you. Mr. Hugg, you have some reserved time. Yes, thank you, Your Honor. I'd like to expand on the last question. The 900 — I don't deny that this man should be entitled to an award and it can be of permanent partial disability. It's the amount that we're talking about that makes it so confounding. What's your response to opposing counsel's comment that Section 10C is a forward-looking — refers to a forward-looking aspect of the law, future earnings and so on, and because he had this higher-paying situation, that's what makes this the higher award? Do you agree with that? I agree with Palacios and Bonner. That's a correct statement. But those — the forward-looking concept is very elastic. It should be applied in a rational manner. The numbers can speak — Rational meaning if they agree with you, it's okay, right? Did you leave a tip? No, no, you weren't there. No, what I mean is that he's entitled to — he had an injury, couldn't go back to the waterfront. That's — and so I can understand the argument and would not quarrel over some limited permanent partial disability. But to say that he made $96,000 and that would be the projection of what he would make from the two jobs is the wild stretch of unfettered imagination. There are many other ways that the judge could have done it, and I urge this Court to consider them or remand for the instructions to consider them. He could take all the wages in 2001, $58,000, which would result in a 10C average weekly wage. This is on page 1ER112, the summary of these earnings, of $1,121.67. So there would be a definite wage loss where he made — was making $1,200 in the year 2001 of the injury versus $933.78 afterward, which I stipulated as the wage earning capacity under Section 8H. The term earning capacity in 10C and the term wage earning capacity in 8H is the same and does have that forward component, but within reason. That would have resulted in a modest permanent partial disability award, which would have been appropriate if you took the actual reality of what he made over the years. Thank you. Thank you, Counsel. The case just argued will be submitted for decision, and the Court will adjourn.
judges: O'scannlain, Fernandez, M. Smith